FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

2001 AUG 15  P 4: 44

CLERK'S OFFICE
AT BALTIMORE

| | |
|---|---|
| ROB FARMER | : |
| | : |
| vs. | : CIVIL NO. L-98-1585 |
| | : |
| DR. DAVID RAMSAY, et al. | : |
| | : |

BY_____ DEPUTY

### MEMORANDUM

This is a racial discrimination suit.  The plaintiff, Rob
Farmer, a white male, contends that he was denied admission to
the University of Maryland School of Medicine ("UMSM") in 1995 on
account of his race.[1]  Farmer alleges that he would have been
accepted had he been an applicant from an "under-represented
minority."[2] Farmer also argues that UMSM's admissions policies
are unconstitutional because the admissions committee, in pursuit
of a diverse student body, considers the race and ethnicity of
applicants when making admissions decisions.

Farmer charges that the Medical School, under a de facto
racial quota system, manipulates applicants' "non-cognitive"
criteria in order to admit minority students with weak grades and
test scores.  According to Farmer, UMSM's stated reasons for

---

[1] Farmer filed this action against the University of
Maryland at Baltimore; the University of Maryland School of
Medicine; Dr. David J. Ramsay, President of UMB; Dr. Donald E.
Wilson, Dean of UMSM; and Dr. Milford M. Foxwell, Jr., Director
of Admissions for UMSM.

[2] The Medical School considers "under-represented
minorities" to include African-Americans, Puerto Rico
mainlanders, Hispanics, Native Americans, and Alaska natives.



rejecting him (idiosyncratic personal statements, mediocre science grades, a tepid recommendation letter from his undergraduate school, and an unsatisfactory explanation for a minor arrest record) are merely pretexts for racial discrimination.

The Medical School denies that it operates under a racial quota system. While the School admits that it considers race as a factor in making admissions decisions, it contends that race is merely one of many criteria that it uses in evaluating applications. The University argues that its limited consideration of race to promote the diversity of its student body is narrowly tailored, and, therefore, permissible under Regents of the University of California v. Bakke, 438 U.S. 265 (1978).

With respect to Farmer's specific claim, the University contends (i) that race did not play any part in the decisions to reject Farmer, (ii) that Farmer's application was so flawed the decision to reject him was not a close call, and (iii) that Farmer would still have been rejected had he been a member of an under-represented minority.

Following extensive discovery and the creation of a lengthy record, the defendants filed a motion for summary judgment; Farmer also filed a motion for partial summary judgment. The Court held two days of hearings. Having carefully considered the

2

record, the Court concludes that there is insufficient evidence
from which a reasonably minded jury could find (i) that race
played any part in the Medical School's decision to reject
Farmer, or (ii) that the Medical School's stated reasons for
rejecting Farmer were pretextual.  For instance, Towson
University, where Farmer took undergraduate science classes,
recommended Farmer only with "reservation" in 1994 and 1995 and
declined to recommend him at all in 1996.  Accordingly, by
separate order, the Court will DENY Farmer's motion for partial
summary judgment and GRANT Defendants' motion for summary
judgment.[3]

---

[3] The Court reaches this conclusion by applying two related
but independent legal tests.  Under the first test, a university
may defeat liability by showing that an applicant would not have
been admitted even if race were removed as a factor in the
decision process. Wooden v. Bd. of Regents of the Univ. of Ga.,
247 F.3d 1262 (11th Cir. 2001); see Mt. Healthy City Sch. Dist.
Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). UMSM has
presented an overwhelming record that Farmer was denied admission
based on his weak applications.

Under the second test, adapted from the familiar burden-
shifting standard that the Supreme Court set forth in McDonnell
Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff must
present evidence that the University's stated reason for
rejecting him is merely a pretext for discrimination. See
Middlebrooks v. Univ. of Md. at College Park, 980 F. Supp. 824,
831 (D. Md. 1997). Farmer has entirely failed to meet this
evidentiary burden.  Because race played no role in the decision
to reject Farmer, we need not decide whether UMSM's admission
system, to the extent that it takes race into consideration, runs
afoul of the Constitution.

3

## I.   Factual Background

### a.  UMSM

The University of Maryland School of Medicine is the only public medical school in the State.  Admission to UMSM is highly competitive; UMSM admits only about six percent of applicants. In 1995, the School received more than 4400 applications for approximately 140 spaces.

### b. Admissions

UMSM considers applications in four stages.  At the first stage, applications are filtered by residency, grade point average (GPA), and scores on the Medical College Admissions Test (MCAT).[4]  Applications from Maryland residents are almost invariably sent to the second stage.[5]  Many applications from non-Maryland residents with low GPA or MCAT scores, however, are rejected at the first stage.[6]

The School sends surviving applicants a "second stage" application packet, which requests more detailed information.

---

[4] Applicants fill out an American Medical College Admissions Service form, which is used by all medical schools in the United States.  The form permits, but does not require, applicants to identify their race or ethnic background.

[5] In 1995, only seven Maryland residents were rejected at stage one based on (i) an incomplete application, (ii) failure to take the MCAT, or (iii) actual residency outside of Maryland.

[6] In 1995, the admissions committee rejected 2,392 non-resident applications at stage one.

4

All candidates who complete second-stage applications are considered by the full admissions committee, which meets every week. Each application is assigned to a committee member, who presents the applicant to the committee and recommends whether the candidate should be interviewed or not. The full committee makes the ultimate decision whether to interview, however.

In stage three, applicants are interviewed in person by two UMSM faculty members. After the interview, the applicant's file is again presented to the committee, which votes either to reject or offer admission (stage four). Rejected applicants may appeal to a subcommittee, which has the authority to send the candidate back to the full committee for further review.

## c. Admissions Criteria

According to the School's catalog, UMSM considers an applicant's "academic achievement, extracurricular activities, personal characteristics, recommendations from the premedical committee or college instructors, scores on the Medical College Admissions Test (MCAT) and personal interview." It is also the School's policy to give special consideration to applicants who have demonstrated leadership or who come from communities that lack medical services.

5

The School's written strategic plan explicitly calls for a
"diverse" student body.[7]  In pursuit of this goal, the admissions
committee uses several outreach programs.  One such, the
federally funded "Advanced Pre-Medical Development Program" ("the
Program"), in which Farmer himself participated, offers free MCAT
preparation courses and special admissions counseling to minority
and/or poor individuals considering medical school.

Every member of the admissions committee receives a report
including the applicant's "objective" data,[8]  a personal
statement, and letters of recommendation (which are graded, from
A+ to F, by the Associate or Assistant Dean of Admissions).
According to School policy, committee members are permitted to
consider this information as well as what the School terms, "non-
cognitive" criteria.[9]  An applicant's race is printed on the
application; therefore, race is included in the total mix of
information a committee member receives when asked to vote to

---

[7] According to the School, the measures of diversity include
"race, ethnicity, age, work, and life experience."

[8] Objective data includes an applicant's grades, MCAT
scores, undergraduate and graduate institutions attended, degrees
earned, age, race, and residency (Maryland, out of state, or
international).

[9] "Non-cognitive" criteria includes an applicant's (i)
geographic origin, (ii) quality of schools attended, (iii)
parents' educational background, (iv) work history, (v) past
leadership positions, (vi) maturity, (vii) documented interest in
medicine or medical research, (viii) past hardships, and (ix)
interest in working in a particular community after graduation.

6

interview or reject a candidate (in the second stage).[10]   Of course, the race of an applicant is apparent once the applicant shows up for an interview (stage three).

### d. Rob Farmer

Following graduation from high school, Farmer spent nine years rock climbing, hitchhiking, and juggling.  He also worked sporadically as a part-time volunteer EMT at a fire department. In 1987, at the age of 27, Farmer enrolled at the University of Colorado, Boulder to study English, the media, and advertising. Uninterested in a medical career at the time, Farmer took few courses in the sciences.

Farmer completed his studies at Colorado in 1991.  The same year, Farmer moved to Maryland to work for his father.  This work was the only paid employment experience Farmer listed on his applications.  To the admissions committee, Farmer described his job as "fixing houses in the ghetto," which he characterized as "enormously depressing."  In late 1994, after this "family business experiment produced unsatisfactory results," Farmer decided to pursue a career in medicine.

---

[10] While the School admits taking race into account in an effort to achieve diversity, there is no evidence that UMSM segregates applications into different tracks based on race, sets aside a specified number of spots for minorities, or operates under an express quota system.  See Lutes v. Goldin, 62 F. Supp. 2d 118, 128 (D.D.C. 1999). Cf. Talbert v. City of Richmond, 648 F.2d 925, 928 (4th Cir. 1981).

Because Farmer's undergraduate course work did not meet basic UMSM's requirements for matriculation, Farmer, from 1992 to 1995, took science courses at Towson University.[11]  His grades were, as he concedes, mediocre.  Farmer earned a GPA in the sciences of 2.8, receiving "C" grades in several classes, including Basic Math & Science, General Chemistry, Organic Chemistry, and Immunology.  In April 1994, Farmer took the MCAT for the first time, receiving grades he also concedes were poor.[12]

Farmer applied to UMSM three times: in 1994, 1995, and 1996. Farmer acknowledges that his 1994 application, which included his first MCAT score, was weak and he is not contesting his rejection that year.[13]  In 1995, Farmer participated in UMSM's Advanced

---

[11] UMSM requires that applicants complete eight hours each in the biological sciences, general chemistry, and general physics and six hours each in organic chemistry and English prior to matriculation at the School.  Farmer's undergraduate record did not satisfy these requirements.

[12] Farmer took the MCAT twice: in April 1994 and August 1995. On the 1994 examination, Farmer received the following scores:  Verbal Reasoning - 11 (85-96 percentile), Physical Sciences - 6 (13-27 percentile), Writing Sample - P (63-75 percentile), and Biological Sciences - 7 (24-37 percentile).

[13] Farmer does not in this suit dispute the rejection of his first application to UMSM.  Nevertheless, he used one of his personal statements to argue his view that the academic prerequisites for admission to U.S. medical schools are irrelevant both to selecting qualified medical school students and to a future doctor's ability to practice medicine.

Premedical Development Program, retook the MCAT, improved his
score, and reapplied.[14]

Of the three applications Farmer submitted, his second
application, in 1995, was the strongest. His case, therefore,
focuses on his rejection that year. Although Farmer also applied
in 1996, Towson University refused to recommend him that year, so
his application was essentially dead on arrival. Accordingly,
the Court will concentrate on UMSM's decision to reject Farmer in
1995.

### Farmer's Second (1995) Application

Farmer applied to the UMSM for the second time in the spring
of 1995 for the 1996 entering class. Because he was a Maryland
resident, his application automatically advanced to the second
stage. Farmer's file included his entire rejected application
from the previous year, his second (and improved) MCAT score, a
second letter of recommendation from Towson University, and
additional personal statements. Farmer's grades, employment
history, and original MCAT score, were, by definition, unchanged.

Hermione Hicks, the Director of Recruitment for the Office
of Admissions at UMSM, presented Farmer's 1995 application to the
admissions committee. Hicks noted that Farmer had not held a

---

[14] On the 1995 MCAT, Farmer received the following scores:
Verbal Reasoning - 10 (75-87 percentile), Physical Sciences - 10
(74-86 percentile), Writing Sample - S (96-99 percentile), and
Biological Sciences - 9 (56-72 percentile).

9

"significant job" as an adult and had spent "an extreme amount of
time" involved in purely recreational activities.  Hicks
recommended against giving Farmer an interview.  After
discussion, the committee unanimously voted 14-0 to reject Farmer
without an interview.

During discovery, Hicks and other committee members
testified that race played no part in the decision to reject
Farmer.  Instead, they consistently stated that the decision was
not a close call given (i) the cool letter of recommendation
Farmer received from Towson,[15] (ii) his relatively low GPA from
Towson, (iii) his less than average MCAT scores, (iv) the quirky
character of his personal statements, (v) Farmer's sparse
employment experience, and (vi) the inconsistent, even flip
explanations Farmer gave for his minor arrest record.  Viewing
the record amassed during discovery, there is substantial
evidence to support each of these concerns and no credible
evidence that the committee raised them to mask discrimination.

## Farmer's Letters of Recommendation

By 1995, Farmer's admissions file contained two sets of
recommendations from Towson University, a public university
located near Baltimore.  Towson's Pre-Medical Committee formally

---

[15] Hicks also testified that in her more than 10 years of
admissions experience, she had "never seen any comment like [the
one on Farmer's recommendation] written about" any student she
had presented to the committee.

10

evaluates each Towson student who applies to medical school. The
Committee, whose longstanding Chair is Dr. Caryl E. Peterson,
places students in one of five categories, which, from best to
worst, are: (i) highly recommended, (ii) recommended with
confidence, (iii) recommended, (iv) recommended with reservation,
and (v) not recommended.

In 1994, Farmer received Towson's second lowest
recommendation, "recommended... with reservation." In an
accompanying letter, Dr. Peterson, who is well regarded by UMSM,
expressed "concerns about whether [Farmer's] personality and
somewhat inconsistent academic performance will lend themselves
to the conventions of the medical profession he hopes to enter."
Dr. Peterson's letter was consistent with another letter that
Farmer himself solicited from one of his Towson instructors,
Chemistry Professor Nordulf Debye. Dr. Debye voiced concerns
about Farmer's "willingness to work effectively with others" and
his "native intellectual curiosity."

When UMSM first rejected Farmer (in 1994), the admissions
committee officially graded Farmer's letter of recommendation a
"C," although Associate Dean Milford Foxwell testified that he
would have given the letter a "D."[16]  In 1995, because of his
improved MCAT score, Towson rated Farmer as "recommended," the

---

[16] Dr. Donna Parker, a member of the admissions committee,
gave Farmer's recommendation letter its official grade.

11

middle of its five categories.[17]  Nevertheless, Dr. Petersen,
again writing on behalf of Towson's Pre-Medical Committee,
submitted essentially the same letter she had submitted the year
before, and continued to express concerns about Farmer.

The first and second letters from Dr. Peterson are virtually
identical, word for word; both offer tepid support for Farmer's
medical school candidacy.  The new recommendation letter received
the same "C" grade from the UMSM admissions committee.[18]
According to Hicks and Foxwell, a "C" recommendation erects a
virtual roadblock to any applicant.[19]

---

[17] The evaluation only improved because of Farmer's higher
MCAT scores; the text of the recommendations are otherwise
identical.

[18] In 1996, in connection with Farmer's third application,
Towson's Pre-Medical Committee chose not to recommend Farmer.  In
her letter, Dr. Peterson stated that "serious reservations"
precluded "a letter of recommendation in support of Mr. Farmer's
application."  The UMSM admissions committee gave Peterson's last
letter an "F," the lowest possible grade.

[19] Discovery failed to produce any applicant (whether
majority or minority) with a "C" letter of recommendation who was
interviewed or admitted.

Farmer's Personal Statements

Farmer's file included six personal statements.[20]   Both
Hicks and Foxwell gave Farmer's statements, which they regarded
as "peculiar," negative marks.  From these statements the
committee learned that Farmer was raised by his mother and spent
his childhood in Virginia, California, Alaska, and Connecticut,
with what he describes as "an unusual amount of freedom." About
his financial condition, Farmer wrote that, "while not poor, we
definitely were not affluent."

Farmer described his path from youth to medical school to
the admissions committee as a "long and winding road."
Describing the nine years following his graduation from high
school, from 1978 to 1987, Farmer wrote that "I lived to climb,
and every other aspect of my life was merely an adjunct to

_____

[20] The six personal statements include: (i) a one-page
statement in his 1994 application (for the 1995 entering class),
(ii) a one-page statement in his 1995 application (for the 1996
entering class), and (iii) four personal statements totaling ten
pages submitted in support of his appeal from UMSM's rejection of
his 1995 application.  Farmer also submitted a one-page statement
in his 1996 application (for the 1997 entering class).  Farmer
also wrote a personal statement to support his application to
UMSM's Advanced Pre-Medical Development Program; that statement
was not available to the admissions committee when it reviewed
Farmer's second application.

   According to Farmer, he submitted three personal statements
in support of his first (1994) and second (1995) applications.
UMSM claims that Farmer sent those personal statements only in
support of his 1995 appeal.  Although the record is unclear, the
Court will assume the committee had the benefit of all three
additional personal statements when it reviewed Farmer's 1994 and
1995 applications.

13

support my climbing."  Farmer worked part-time as a volunteer EMT during this time, but the only information Farmer provided to the admissions committee about this experience was that "some of the people disliked [him] solely because of the length of [his] hair."  Farmer wrote that he chose not to cut his hair because doing so would simply "please some narrow-minded ignoramuses."

Farmer's statements to the admissions committee had other distinctive characteristics.  In one personal statement, quoting from the cartoon "Calvin and Hobbes," Farmer advised that doctors should "be careful or be roadkill."  In another, Farmer wrote that he is a "fairly macho guy (without the stupidity which that implies, please)."

The admissions committee was concerned in general about Farmer's negative attitude towards medicine.  At age nine, Farmer fell out of a tree and broke his arm.  According to Farmer, his doctor "pronounced [him] crippled for life - a terrible falsehood to tell a 9-year old boy."  In response to this and a number of other interactions with doctors, Farmer expressed strong, negative views of the medical profession.  In one personal statement, Farmer wrote that "perhaps most doctors have not read any new medical information in the last 12 years."  According to Farmer, "from taking a very unscientific poll, [he has] determined that nearly everyone has a horror story to tell about a doctor."

14

In sum, Farmer complained about (i) the "absence of compassion" and "ignorance" of a doctor treating his mother, (ii) the incompetence of another physician treating a friend for abdominal pains, (iii) the "substandard" care received by a friend's wife during nasal surgery, (iv) the lack of "common sense" of his own childhood physician, and (v) the "crooked bone in [his] hand" caused by another physician's incompetence.

Farmer also used his personal statements to disparage his fellow applicants to medical school. "Most of the pre-med students I've seen," opined Farmer, "are very good at rote memorization, but they often fall woefully short in areas of common sense, assertiveness, social concern, and knowledge of current events.... Many of my fellow pre-med students have never really even lived on their own - I can't really be expected to compete with them strictly on the basis of grades." In another statement, Farmer wrote, "most of your prospective students are essentially interchangeable units; if one student doesn't fill a need somewhere, someone else will fill the need... that is why it is so important that you accept me."

According to the uncontroverted testimony of Foxwell and Hicks, the admissions committee believed that Farmer's personal statements reflected anger towards the medical profession and condescension towards his prospective classmates. These negative views made Farmer a bad risk for admission, the committee felt.

15

## Farmer's Criminal History

According to Hicks, Farmer's inconsistent explanations of his arrest record raised concerns about Farmer's credibility and character.  Explaining an old criminal mischief conviction on his 1994 application, Farmer wrote that he had been "unjustly accused of damaging a window screen."  Farmer wrote without elaboration that he also failed to appear to answer a charge of "illegal dog-walking."  On his 1995 application, Farmer claimed that he had merely "once pled 'no contest' to something like 4th degree trespassing."  Seeking to clarify the circumstances surrounding his conviction, Farmer further explained that "the woman against whom [he] allegedly trespassed later became [his] girlfriend."[21]

## Admissions Committee Vote

In light of Farmer's weak "C" recommendation, the quality and substance of his personal statements, his uneven academic performance and relatively low GPA from Towson, and his inconsistent explanation for his arrest record, Hicks recommended against offering Farmer an interview.  After a discussion of Hicks' presentation, the committee voted, by a unanimous 14-0 vote, to reject Farmer without an interview.

---

[21] Farmer's explanation of his arrest record in the 1996 application, that he had been "convicted of trespassing and fined $20," was also inconsistent with the first two explanations, but Hicks did not have this explanation before her in presenting the 1995 application.

16

Farmer's Appeal

Farmer appealed his 1995 rejection. In support, Farmer wrote a four-page letter to Associate Dean Foxwell. In the letter, Farmer erroneously wrote that UMSM graduate was suspected of murder. Farmer offered this information as proof that UMSM's "method of student body selection is fallible." Arguing why he should be admitted, Farmer wrote that he "would much sooner run than kill."[22]

Farmer also blamed his past academic performance on a host of factors including his car, which was a "major drain of time, money, and energy." In a long digression, Farmer describes his attempt to purchase a cheap car:

By sitting in the car overnight, I could be the first in line to buy it on Saturday at the special promotional price. I guess it wasn't too bad, but I did get rather scared when the angry black mob (no offense to blacks in general) started banging on and rocking the car at 1:30 a.m. because they were angry at me for arriving first, thus thwarting their ambition to buy a five dollar car. But at least I didn't get beaten up as did the other fellow who claimed a car.

In another part of his letter to the medical school admissions committee, Farmer discusses oil changes:

Nobody ever changes the oil before selling a car, so it is best to assume that it should be changed immediately. After arriving, I went to run an errand, and the "check oil" light came on. The oil was so worn out that I nearly lost my "new" car the day after I

_____

[22] In his letter, Farmer also discussed, in length, his fear arising from skin growths that he had left untreated due to his poverty.

17

> bought it. I swear, my continued existence is so
> tenuous, it seems my life is continually hanging by a
> thread!

Foxwell felt that the letter corroborated the admissions

committee's earlier concerns about Farmer's emotional stability.

Nonetheless, Foxwell accepted Farmer's appeal and submitted it to

a committee (composed of eight admissions committee members),

which voted 8-0 to deny the appeal.  Farmer was informed of the

decision on March 12, 1996.  Farmer visited the admissions office

without an appointment to protest the rejection of his appeal.

Farmer's behavior was sufficiently alarming to cause the staff to

call university security.


## Farmer's Third (1996) Application

Farmer applied a third time, in 1996, for the class entering

in 1997.  This application was a largely futile gesture because

(i) Towson declined to recommend Farmer, stating that the Pre-

Medical Committee had "serious reservations" about his candidacy,

and (ii) the remainder of Farmer's 1996 application was

essentially the same as the 1995 application that the committee

had unanimously rejected.

After his applications to UMSM and other U.S. medical

schools had been rejected, Farmer attended the only medical

school to which he was accepted, the Saba Medical School ("Saba")

in the Netherlands Antilles, where he earned a 2.73 GPA.  With

two years remaining at Saba, Farmer dropped out of medical school

18

altogether. This does not mean that Farmer has abandoned plans for a medical education. Farmer has proffered that he will enter UMSM if the Court orders his admission.

## e. Expert Reports and Evidence Presented by Farmer

### Evidence Presented by Farmer

In the absence of direct evidence that he was rejected for reasons of his race or that the UMSM admissions program operates under a racial quota system, Farmer relies primarily upon (i) the existence of UMSM's stated goal of student diversity, (ii) Farmer's own subjective analysis of his application, and (iii) the reports of two experts, Dr. Robert Lerner and Dr. Sally Satel.[23]

### Lerner Report

Dr. Robert Lerner, a sociologist who has worked on several articles critical of affirmative action in higher education, attempts to "demonstrate that Farmer was more qualified than the Program attendees whom UMSM admitted."[24] Lerner's two reports are essentially divided into three sections: (i) a comparison of Rob Farmer's MCAT scores with the scores of certain admitted

---

[23] Dr. Satel's report is actually a set of two affidavits, totaling 14 pages.

[24] The "Program" is the same federally funded "Advanced Pre-Medical Development Program" discussed supra, in which Farmer also participated.

19

under-represented minority students, (ii) a comparison of the MCAT scores of admitted white UMSM students with the scores of admitted under-represented minority UMSM students overall, and (iii) the relationship between undergraduate grades, MCAT scores, and subsequent performance in medical school.

In part one of his report, Lerner compares Farmer's MCAT scores with those of four African-American students who attended the Program with Farmer and were subsequently admitted to UMSM.[25] Lerner highlights the fact that student B12 received a significantly lower MCAT score than Farmer.[26] Lerner concedes, however, that student B12's other qualifications were stronger than Farmer's: a science GPA of 3.58 compared with a 3.0 for Farmer; an overall GPA of 3.73 compared with 3.41 for Farmer; and recommendation of "recommended with confidence" which received an "A-" grade from the UMSM admissions committee.[27]

_____

[25] These four students are identified as students B12, B19, B1-1996, and B2-1996. All four students are African Americans.

[26] Student B12 received the following MCAT scores: Verbal Reasoning - 5, Physical Sciences - 6, Writing Sample - M, and Biological Sciences - 6. For Farmer's MCAT scores, see supra n.14.

[27] Student B12's recommendations were glowing: "[B12] is an extremely good candidate for medical school... She has been extremely successful at [Loyola College, which is located in Baltimore] doing A to A- work for her whole academic career, while carrying a combined Biology/Chemistry major... We enthusiastically support [B-12's] application to medical school. We believe that she has the academic, intellectual, emotional and social skills to master the medical school curriculum and to become an excellent physician." B12's recommendation also

20

Lerner also acknowledges that student B2-1996, who had lower MCAT scores than Farmer, possessed academic qualifications that were stronger than Farmer's: a science GPA of 3.85 compared with a 3.0 for Farmer; an overall GPA of 3.81 compared with 3.41 for Farmer; and a strong recommendation from the University of Maryland at College Park, which received an "A" grade from the UMSM admissions committee.[28] Despite a lower MCAT score, student B19 also had a better academic record than Farmer: an overall GPA of 3.47 from Cornell University; a science GPA of 3.21; and a recommendation from Cornell which received a "B+" grade from the UMSM admissions committee.[29]

Despite his concession that all four students who attended the Program with Farmer had stronger (or as he contends in one

_____

included a statement that the "Health Preprofessional Committee evaluates all pre-med students by identical criteria. No consideration has been given in this evaluation to the fact that a student belongs to an under-represented minority."

[28] Student B2-1996's recommendations were very strong: "[B2-1996] has maintained a 3.8 GPA while a major in biology.... In three of six semesters here, [B2-1996] earned straight A's, once while completing three lab courses... All in all, [B2-1996] is an impressive student and person... Her career in medicine will continue to evidence high levels of academic excellence and humane compassion. [B2-1996] has my absolute highest recommendation for admission."

[29] According to Dr. Jean R. Robinson, Chairperson of Cornell's Health Careers Evaluation Committee, "It is with great pleasure that we recommend [B19]. She is a fine human being and one of our most well rounded and accomplished students, whose commitment to excellence in medicine is unexcelled. We have no doubt that she will be an outstanding physician and make important contributions to the field."

21

case, similar) academic credentials, Lerner asserts that "Farmer is more qualified for admission to UMSM than the four Program attendees." Lerner justifies his conclusion by minimizing the importance of undergraduate grades because of the "well-known subjectivity of grades as measures of student achievement." Thus, Lerner concludes, for example, that it is "quite reasonable to discount applicant B12's high grades as indicating superior qualifications to Farmer."

Lerner's comparison of Farmer's credentials to those of all under-represented minority students who were admitted to UMSM yields similar results: while many minority applicants to UMSM had lower MCAT scores than Farmer, 77% of African-American applicants and 88% of other under-represented minority applicants had higher undergraduate science GPAs than Farmer. Based solely on this data, Lerner concludes that "no black enrollee (with one possible exception) is more qualified than Farmer."

In part two of his report, Lerner compares the grades and MCAT scores of white and Asian admitted students with those of admitted students from under-represented minorities.[30] Lerner's

_____

[30] According to Lerner's report, minorities that are "non-preferred" include Chinese, Hawaiian, Korean, Asian Indian, Pakistani, Vietnamese, and "other" Asian. Lerner's report lumps the grades and MCAT scores of whites in with those of their "non-preferred" minority counterparts. Lerner provides, therefore, a comparison between white applicants (a group Farmer belongs to) and non-preferred" minority applicants (a group Farmer does not belong to) on the one hand, and under-represented minorities minorities on the other.

22

findings are, in many respects, similar to those made in the first part of his report: the average MCAT score of an under-represented minority applicant is lower than the average MCAT score of a white or Asian applicant.[31]  Unstated in Lerner's report, however, is the fact that the average UMSM applicant's overall GPA and science GPA (for whites, Asians and all under-represented minorities alike) were higher (and in some cases substantially so) than Farmer's.

The third and final part of Lerner's report addresses whether grades and MCAT scores are a good proxy for performance in medical schools.  Lerner concludes that MCAT scores, college grades, and college science grades are indeed correlated with subsequent medical school performance, with MCAT scores constituting the single most predictive factor.[32]

_____

[31] There is a substantial union between the two groups. For example, 29% of under-represented minority applicants have combined MCAT scores between 40 and 44; 24% of whites and Asians have similar scores.  A performance gap is apparent at the two ends of the MCAT score range, however: 31% of under-represented minority applicants have combined MCAT scores between 35 and 39; only 10% of whites and Asians have similar scores; similarly, 35% of whites and Asians have combined MCAT scores between 45 and 49; whereas only 9% of under-represented minority applicants have similar scores.

[32] Farmer's own performance at Saba undermines the empirical value of Lerner's MCAT correlation analysis. According to Lerner, "an individual's MCAT scores alone have considerably stronger correlations with his or her performance than do his or her grades: a .67 correlation with 1 year medical school GPA, [and] a .64 correlation with year 1 and 2 cumulative school GPA." Farmer's MCAT scores were significantly higher than student B12. Ultimately, however, Farmer earned a two-year cumulative GPA of

23

The Defendants have filed a motion to strike Dr. Lerner's report because Farmer hired Lerner on a contingency basis. When questioned about this at oral argument, Farmer's counsel explained that his client lacked the funds necessary to pay an expert in advance. This explanation is unsatisfactory. Under the common law in most jurisdictions, including Maryland, "it is improper to pay an expert witness a contingent fee." Md. Rules 16-812, Rules of Professional Conduct 3.4 cmt. (2000).[33]  As Chief Judge Motz of this Court observed, "witness contingency fee agreements affirmatively violate the fundamental policy of Maryland and the United States." Accrued Financial Services, Inc. v. Prime Retail, Inc., 2000 WL 976800 at *3 n.3 (D. Md. June 19, 2000). See Cosgrove v. Sears Roebuck and Co., 1987 WL 33595 (S.D.N.Y. Dec. 21, 1987).[34]

---

2.73 at Saba, while student B12 earned a slightly higher two-year cumulative GPA of 2.77 at UMSM.

[33] In §1983 claims, Congress explicitly provided that, absent a suitable federal law provision, "the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction... is held... shall be extended to and govern the said courts in the trial and disposition of the cause." 42 U.S.C. § 1988. See Wilson v. Garcia, 471 U.S. 261, 281 (1985).

[34] In Accrued Financial, this Court held that "financial arrangements that provide incentives for the falsification or exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of the witnesses." 2000 WL 976800 at *3.

24

Accordingly, the Court will, by separate order, grant defendants' motion and strike Lerner's reports. Even if the reports were admitted, however, they would add little, if any, weight to Farmer's case. As discussed infra, Farmer can withstand summary judgment only if he can offer credible evidence that (i) race played a role in the decision to reject him, or (ii) that the admissions committee's stated reasons for rejecting Farmer without an interview were pretextual.

Lerner's report does show a gap between the MCAT scores of whites (and Asians) and under-represented minorities. The report sheds no light, however, on whether (i) Farmer was passed over in preference for a minority applicant, or (ii) Farmer himself would have been admitted had he been the member of a different race. In analogous Title VII cases, the Fourth Circuit has repeatedly held that "raw statistics devoid of any context which relates those statistics to the alleged discriminatory practice are of minimal probative value." Williams v. Cerberonics, Inc., 871 F.2d 452, 454 (4th Cir. 1989)(citations omitted).[35]

---

[35] Lerner's numerical comparison of applicants' qualifications also has a serious weakness. Farmer acknowledges that Lerner's analysis includes only "qualifications that could be expressed numerically." Consequently, under Lerner's analysis, a science GPA of 3.0 from a highly competitive and selective school is considered the same as a science GPA of 3.0 from a less competitive one. This shortcoming may be especially important because many of the African-American candidates to UMSM attended highly selective undergraduate institutions. For example, student B19 attended Cornell University and earned a science GPA of 3.21, compared to Farmer's 3.0 science GPA from

25

Satel Report

Farmer's second expert witness, Dr. Sally Satel, is a staff psychiatrist at a methadone clinic in Washington, D.C. and self described specialist in the field of mental health policy and drug abuse. Satel served on the admissions committee of the Yale University School of Medicine in the early 1990s. In her affidavits, Satel compared Farmer's 1996 application with those submitted by four African American applicants who were admitted.

Satel argues that Farmer's overall application is better (or at least not worse) than two of the African-American applications she reviewed. Satel opined that an applicant from an under-represented minority group with Farmer's credentials would have been accepted by UMSM. According to Satel, the most important factor in an application to Yale Medical School is the applicant's MCAT scores, followed closely by an applicant's grades. The same is true, "at other medical schools around the country," Satel opines, although without corroboration.

The Defendants have filed a motion to strike Dr. Satel's report on the grounds that it lacks the necessary indicia of reliability required under FRE 702. The Court agrees and will, by separate order, grant the motion. Satel offers little more

---

Towson.  Despite this, Lerner concludes that "the grade gap between Farmer and B19 is small."

26

than her personal opinion of Farmer's application and the weight
that UMSM should have placed on his MCAT scores.

Satel has no familiarity with UMSM; she lacks an extensive
background in medical school admissions; she reviewed a total of
only five applications; her work has not been subjected to any
peer review; and her opinions are not based on a methodology that
can be tested.  Accordingly, her views lack the indicia of
reliability required under Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993). See Samuel v. Ford Motor Co., 96 F. Supp. 2d
491, 493 (D. Md. 2000).

Even if Dr. Satel's report were admissible, the Court could
not accord it much, if any, weight.  As stated, the report
consists entirely of Satel's personal evaluation of the
applications.  A plaintiff's (or his expert's) personal
evaluation of his own qualifications is, however, irrelevant.
Courts have repeatedly held that such subjective personal
judgments do not raise a genuine issue of material fact. See
Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); Bradley v.
Harcourt, Brace and Co., 104 F.3d 267, 270 (9th Cir. 1996);
Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989).

## Applications of Minorities Not Interviewed

In an attempt to uncover evidence in his favor, Farmer
proposed one other form of comparison between his application and
applications from under-represented minorities.  At oral

27

argument, Farmer's attorney challenged the University to produce
the application of any African-American candidate with a "C"
recommendation and an academic record similar to Farmer's who was
not interviewed.

In response, the School proffered that no African-American
applicant with a recommendation letter rated lower than a "B" was
interviewed.  The University also produced the application of an
African-American female student from Cornell University.
Cornell's letter of recommendation did not contain anything
similar to the negative language in Towson's recommendation.  The
letter was, by any measure, a stronger endorsement than
Farmer's.[36]  The admissions committee also gave the letter a "C"
grade and the African-American applicant was not granted an
interview.

## II. Summary Judgment Standard

The Court may grant summary judgment when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits, if any, show that there is no genuine
issue as to any material fact and that the moving party is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c);

---

[36] According to Dr. Jean R. Robinson, Chairperson of
Cornell's Health Careers Evaluation Committee, the student's
undergraduate record could be "characterized as a studied effort
at building academic and personal confidence" and the student had
"come a long way in her efforts at Cornell."

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also
Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir.
1987) (recognizing that trial judges have "an affirmative
obligation" to prevent factually unsupported claims and defenses
from proceeding to trial).

Nevertheless, in determining whether there is a genuine
issue of material fact, the Court views the facts, and all
reasonable inferences to be drawn from them, in the light most
favorable to the non-moving party. Pulliam Inv. Co. v. Cameo
Properties, 810 F.2d 1282, 1286 (4th Cir. 1987). In order to
survive summary judgment, the non-moving party must present
evidence from which a reasonable jury could return a verdict in
its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).

## III. Discussion

Farmer makes two claims for relief. The first is
retrospective; he seeks an order requiring the Medical School to
admit him because he was rejected for discriminatory reasons.
The second is prospective; even if the court does not order his
admission, Farmer intends to reapply and seeks an order barring
the Medical School from using race as an admissions criterion in
the future.

29

Retrospective Relief

The Court will first analyze Farmer's claim for retrospective relief under two separate but related tests. The first, the "same decision" test, is discussed in a recent decision from the Court of Appeals for the Eleventh Circuit. Wooden v. Bd. of Regents of the Univ. of Ga., 247 F.3d 1262 (11th Cir. 2001).

In Wooden, the University of Georgia contended that it would have rejected the plaintiff regardless of any constitutional violation, and that he, therefore, lacked standing to challenge the University's admissions process. Applying the Supreme Court's reasoning in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977), the Eleventh Circuit classified the university's "same decision" argument as a complete defense on the merits rather than a challenge to standing. Wooden, 247 F.3d at 1280.

Under the "same decision" defense, a university may defeat liability by showing that an applicant would not have been admitted even if race had played no role in the decision process. See Wooden, 247 F.3d at 1281. This Court finds the Wooden analysis persuasive and consistent with current Supreme Court precedent.[37]

---

[37] "Simply put, where a plaintiff challenges a discrete governmental decision as being based on an impermissible criterion and it is undisputed that the government would have

30

The second test, outlined in Middlebrooks v. University of Maryland at College Park, 980 F.Supp. 824, 831 (D. Md. 1997), adapts to university academic decisions the familiar burden-shifting standard that the Supreme Court set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To withstand summary judgment, a plaintiff must present evidence that the University's reason for rejecting him is merely a pretext for discrimination.

Under neither of these tests can Farmer withstand summary judgment. As an initial proposition, courts are ill-advised to serve as super-admissions committees, replacing schools' professional judgments with their own. See Wharton v. Abbeville School Dist. No. 60, 608 F.Supp. 70, 75 (D.S.C. 1984); Lee v. U.S., 914 F.Supp. 489, 493 (N.D. Ala. 1996). The Supreme Court has instructed that judges are to show "great respect for the faculty's professional judgment" when asked to review academic decisions. Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225 (1985).

---

made the same decision regardless," relief is not warranted. Texas v. Lesage, 528 U.S. 18, 21 (1999); see also Mt. Healthy, 429 U.S. at 287. Cf. Northeastern Florida Chapter, 508 U.S. at 666 (noting that though a government-contracts plaintiff need not show that it would have won the contract but for consideration of race, it yet must "demonstrate that it is able . . . to bid on contracts"); see also Hopwood v. Texas, 78 F.3d 932, 957 (5th Cir. 1996).

This Court may intervene only if Farmer can offer evidence from which a reasonable jury could conclude (i) that race played a role in the decision to reject him or (ii) that the admissions committee's stated reasons for rejecting him were pretextual. This Farmer cannot do.

Farmer offers no direct evidence of discrimination. To the contrary, all of admissions committee members who were asked testified that Farmer's application was so weak that rejecting him was not a close call and that race played no part in the decision.

As stated above, in the absence of direct evidence of discrimination, Farmer is forced to rely on (i) the mere existence of UMSM's stated goal of student diversity, (ii) testimony that the School's admissions committee may take race into consideration as one factor out of many, (iii) his own subjective analysis of his application, and (iv) the reports of his experts.

These factors are unavailing. There is no evidence that UMSM operates a racial quota system under which it sets aside a certain number of spots for under-represented minorities or that it automatically upgrades minority applications. Simply because

32

the committee may take race into consideration does not mean that race was necessarily a factor in Farmer's rejection.[38]

Farmer was not a candidate high on the waiting list; he cannot, therefore, plausibly argue that the seat he would have otherwise received was given to a minority applicant with a lesser resume. Farmer's resume was weak relative to the others UMSM received; of the 4,466 applications submitted, Farmer was among the 3,800 applicants rejected without an interview. Of the 518 candidates who survived to the interview stage, only 299 were accepted. Because hundreds of applicants with MCATs and GPAs better than Farmer's were also rejected, Farmer would not even have qualified for a spot on the "interview" waiting list, if such a waiting list existed.

Farmer cannot reasonably contend that he would have been accepted under an admissions scheme that employed only evenly applied objective criteria. Instead, Farmer's only plausible argument is that he would have been admitted if the same arguably diluted standards applied to minorities were applied to him alone out of all the white or Asian candidates. Even this argument fails, however. UMSM has produced credible evidence that all applicants, minority and majority alike, with academic records

---

[38] Despite Farmer's contention to the contrary, no evidence supports the proposition that the school's goals for diversity constitute illegal "quotas" for the number of minorities that are interviewed or accepted. See supra, n.10.

33

and "C" letters of recommendation similar to Farmer's were
neither accepted nor interviewed.[39]

Farmer's own evaluation of his application and belief that
he should have received an interview is irrelevant. As this
Court has repeatedly stated in Title VII cases, a plaintiff's own
subjective belief that he is sufficiently qualified is
insufficient to counter substantial evidence of legitimate
nondiscriminatory reasons offered by a defendant.[40]

There is also no evidence that the admissions committee
manufactured a reason (as a pretext for discrimination) to deny
Farmer admission on account of his race. The admissions
committee has pointed to concern over Farmer's poor undergraduate
science grades, his lack of work experience, the troublesome
personality traits reflected in his personal statements and
letter of appeal, and his inconsistent explanation for a minor
arrest record.

_____

[39] Relying on Satel's report, Farmer also argues that his
recommendation letter should have received a higher grade. But
no other letter in the record, for a white or minority candidate,
casts explicit doubt upon the viability of an application;
Farmer's recommendations do. Furthermore, because the UMSM
explicitly acknowledges the consideration of race in the
admissions process, the University has no reason to skew its
analysis of applicants' recommendation letters. Farmer has
submitted no evidence from which the Court can infer that the
University does so.

[40] See discussion and citation to cases supra, p. 27.

34

All of these concerns are fully supported by and documented in the record. Given the extremely competitive nature of medical school admissions, with only 143 slots available for 4,466 applicants, any one of the negative factors in Farmer's applications, considered alone, would be sufficient to preclude his admission to the UMSM. No reasonable juror reviewing the record could conclude (i) that Farmer would have been interviewed, much less accepted, had he been a minority applicant, or (ii) that Farmer would have been interviewed or accepted if race had played no role whatsoever in the admissions process, or (iii) that concerns about Farmer were "made up" in order to reject him.

## Prospective Relief

Whether and to what extent a public university may consider race in admissions has been a matter of considerable recent debate as has the separate but related question of who may challenge a university's admissions practices.[41] Having reviewed

---

[4] Recent cases in other federal circuits have cast doubt upon the continuing force of Justice Powell's opinion in Regents of the University of California v. Bakke, 438 U.S. 265 (1978) (holding that universities may consider race as a factor in admissions but may not impose numerical racial quotas). See Hopwood v. State of Texas, 78 F.3d 932 (5th Cir. 1996); Grutter v. Bollinger, 137 F. Supp. 2d 821 (E.D. Mich. 2001), stayed pending appeal by 247 F.3d 631, 633 (6th Cir. 2001). But see Smith v. Univ. of Washington, Law School, 233 F.3d 1188, 1200 (9th Cir. 2000); Gratz v. Bollinger, 122 F. Supp. 2d 811 (E.D. Mich. 2000). Because the weaknesses of Farmer's application doomed it regardless of his race, the Court need not reach this

35

the full record created during discovery, the Court concludes that Farmer should not be permitted to pursue a "generally available grievance about government," as the Supreme Court has "consistently held." Lujan, 504 U.S. at 573. See FEC v. Akins, 524 U.S. 11, 20 (1998); Allen v. Wright, 468 U.S. 737, 761 (1984); Valley Forge Christian College v. Americans United for the Separation of Church and State, 454 U.S. 464, 474-75 (1982).

Farmer reads Adarand and its progeny as granting him the right to an injunction forbidding the use of race as a factor in the UMSM admissions process, even though Farmer's own application under that process would be futile. Adarand Constructors v. Pena, 515 U.S. 200, 211 (1995); see also Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville, 508 U.S. 656, 666 (1993). Adarand cannot be stretched that far. Such a reading would presumably permit even applicants lacking the requisite formal qualifications to challenge a medical schools' admissions processes merely by stating an intent to apply.

This Court does not believe that Adarand so abrogated the Supreme Court's regular and consistent teaching on the constitutional limits of standing. See Lujan, 504 U.S. at 576; see also Friends of the Earth v. Laidlaw, 528 U.S. 167, 191

---

constitutional question.   See Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346 (1936).

(2000); <u>Friends of the Earth v. Gaston Copper Recycling</u>, 204 F.3d 149, 153 (4th Cir. 2000).

Although Farmer, like any person, has the potential to improve his resume, only a much stronger application would have a chance of success. Unless and until Farmer improves his application markedly, his claim is simply too speculative. <u>See</u> <u>Proctor v. Prince George's Hosp. Center</u>, 32 F. Supp. 2d 830, 833 (D. Md. 1998); <u>Baltimore Gas and Elec. Co. v. U.S.</u>, 133 F. Supp. 2d 721, 727 (D. Md. 2001).[42]

## IV.  Conclusion

For the reasons stated above, this Court shall, by separate Order, GRANT defendants' Motion for Summary Judgment.

Dated this 15TH day of August 2001.

Benson Everett Legg
United States District Judge

---

[42] Farmer is among the "abstractedly distressed," not the "truly afflicted." <u>Friends of the Earth</u>, 204 F.3d at 154.